IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLENN LEATHERBURY, | No. CV 10-01969 SI |
|     Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| C&H SUGAR CO., INC.; AMERICAN SUGAR REFINING, INC.; and DOES 1-100, | |
|     Defendants. | |

On November 8, 2012, the Court heard oral argument on defendants' motion for summary judgment. The Court directed the parties to submit supplemental briefing on plaintiff's cause of action for failure to pay overtime. Having carefully considered the arguments of counsel and the papers submitted, the motion is GRANTED, for the reasons set forth below.

**BACKGROUND**

Plaintiff Glen Leatherbury was hired by defendant C&H Sugar Co., Inc. as a Warehouse Supervisor in March 2007, and he was fired two years later in May 2009. Leatherbury filed a complaint in April 2010 against defendants C&H Sugar Co., Inc., American Sugar Refining, Inc., and Does 1-100 (collectively "C&H"). Of his causes of action still contested, he alleges violations of the Fair Employment and Housing Act ("FEHA") for (1) disability discrimination; (2) failure to engage in an interactive process for his disability; (3) failure to accommodate; (4) race discrimination; (5) retaliation; (6) wrongful termination; (7) failure to prevent discrimination and retaliation; and (8) a violation of California Labor Code § 510 for failure to pay overtime.

1. **Early Performance at C&H**

Plaintiff Leatherbury was interviewed by C&H before he was hired as a Warehouse Supervisor in March 2007. Decl. of Glenn Leatherbury in Supp. of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Leatherbury Decl.") at ¶ 3. Prior to C&H, Leatherbury had served in the United States military, and worked as a logistical manager. *Id.* at ¶ 2. During the interview, HR Manager Kyle Stradleigh told him that C&H had an adversarial relationship with the unions. *Id.* at ¶ 3. Leatherbury had never worked with union employees before. *Id.*

As a Warehouse Supervisor, Leatherbury's main duty was to supervise a shift of 8-12 union employees, which included giving safety briefs, getting feedback on safety issues, speaking to employees on safety issues, reporting employee misconduct, and giving employees verbal or written warnings. *Id.* at ¶ 6-8. Additionally, he prepared shift reports, checked the plant for cleanliness, dealt with customer service, responded to various issues, and participated in managerial meetings. *Id.* His typical day began as follows: he reviewed the previous shift report for problems, he analyzed the bills of lading to decide whether to load sugar from AS/RS or the floor inventory, he checked Kronos to see if his union employees punched in correctly, he would pull an extra worker off the belt or the spur if he was short, he would check emails for 10-15 minutes, he would inspect the trucks and equipment, and then he would give a safety briefing to his crew. Supplemental Decl. of Matthew A. Goodin in Supp. of Defs.' Mot. for Summ. J., Ex. A ("Leatherbury Dep. II") 106, 108-11,118-20. For the remainder of his shift, he would patrol the warehouse to monitor his union employees, and then spend 5-10 minutes each hour updating his shift report. *Id.* at 43, 85, 118-19.

Warehouse Superintendents do not have the authority to hire or fire union employees. However, it was the practice at C&H for them to sit in on interviews, and their opinion was given a great deal of deference and weight. Decl. of Kyle Stradleigh in Supp. of Defs.' Supplemental Brief in Supp. of Mot. for Summ. J. ("Stradleigh Decl.") ¶ 4; Supplemental Decl. of Francine Cronin in Supp. of Defs.' Mot. for Summ. J. ("Cronin Supplemental Decl.") ¶ 3. Under HR Manager Stradleigh, Leatherbury could issue a verbal or a written warning to a union employee at his discretion. Stradleigh Decl. ¶ 5; Leatherbury Dep. II at 77-78. Under Cronin, who replaced Stradleigh in March 2008, Leatherbury had to get approval to issue a written, but not a verbal, warning, although Cronin gave a great deal of

deference to discipline recommendations. Cronin Supplemental Decl. ¶ 4; Leatherbury Dep. II at 75-76. Stradleigh stated that he would give a "great deal of deference" to a Warehouse Supervisor's recommendation to fire an employee because the supervisor was "closer to the particular situation than [Stradleigh] was." Stradleigh Decl. ¶ 5. Similarly, Cronin stated that she "would give a great deal of deference" to a Warehouse Supervisor's recommendation for termination. Cronin Supplemental Decl. ¶ 4.

In April 2007, Leatherbury received his first performance review by then-Warehouse Manager Don White. Kenneth N. Frucht's Decl. in Supp. of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Frucht Decl."), Ex. L. The summary appraisal rating was "Needs Improvement: Indicates performance that does not meet the established requirements of the position. . . . *appropriate for employees that are new to a position where there is need for continual learning to get up to speed.*" *Id.* (emphasis in original).

In March 2008, Lemmie Adams, an African-American, was hired as the new Warehouse Manager. Leatherbury Decl. ¶ 14. In July 2008, Leatherbury received a performance review from Adams. *Id.*, Ex. M. The summary appraisal rating was "Met Expectations," and in the category of technical knowledge he was above expectations. *Id.* On December 16, 2008, Leatherbury sent HR Manager Francine Cronin an email alleging that Adams was racially discriminating against Caucasian Warehouse Supervisors, because he praised Stacy Wise, an African-American, for loading 43 trucks on his shift, but did not praise Leatherbury, a Caucasian, for loading 44 trucks. Frucht Decl., Ex. H. Additionally, when Wise loaded 43 trucks again, Adams put the achievement on the bulletin board with a "gold star," but did not give any recognition to Leatherbury when he loaded 41 trucks. *Id.* Leatherbury alleges that Cronin did not respond to the email, Leatherbury Decl. ¶ 18, although Cronin remembers speaking to him about it, Frucht Decl., Ex. I.

In March 2009, Mike Burchell, the Process Manager, made a request to Thomas Merritt, the Refinery Manager, for assistance on the docks. Decl. of Thomas "Kim" Merritt in Supp. of Defs.' Mot. for Summ. J. ("Merritt Decl.") ¶ 4. Merritt approved the transfer of Leatherbury to help Burchell on the docks. Leatherbury Decl. ¶ 21. Leatherbury thought his new position was great, although he incorrectly thought Adams was responsible for his move. *Id.* Lemmie Adams was fired that same month. Merritt Decl. ¶ 5.

3

### 2. Leatherbury's Performance as Packing Supervisor

In May 2009, as part of a reorganization, Leatherbury was assigned to a new position as a second Packing Supervisor, and he was supervised by Cliff Sullivan and Sam Lee. Leatherbury Decl. ¶¶ 22-23; Merritt Decl. ¶ 6. After a week, Lee and Sullivan gave him an informal verbal quiz, and Leatherbury performed poorly. Leatherbury Decl. ¶ 24. Sullivan reported to Merritt that he was not satisfied with Leatherbury's progress. Decl. of Clifford D. Sullivan in Supp. of Defs.' Mot. for Sum. J. ("Sullivan Decl.") ¶ 4. He also reported that Leatherbury had said he did not like his new position because his last position was easier, and this demonstrated his poor attitude. Sullivan Decl. ¶ 3; Merritt Decl. ¶ 7. Leatherbury admits that he said he was not excited about his new position, although he denies that he said that his previous position was easier. Leatherbury Decl. ¶ 24.

Later that day, Leatherbury observed boxes piling up on a conveyor belt, in what he perceived was a dangerous situation. Leatherbury Decl. ¶ 25. He knew that only a union employee should fix the conveyor jam, but after waiting five minutes, Leatherbury cleared the conveyor himself. *Id.* A union employee saw this incident and complained to the union; later Sullivan told Leatherbury that he had violated the union collective bargaining agreement, and only a union employee should have cleared the conveyor jam. *Id.*

On May 28, 2009, Lee told Sullivan that he had heard a report from two union employees that Leatherbury had been talking to them in the locker room, and had told them that it would not matter if the union went on strike, because C&H would just bring in replacement employees from the East Coast. Sullivan Decl. ¶ 6. Sullivan called these two employees into his office, and they confirmed these comments. *Id.* Sullivan and Lee then called Leatherbury into the office, but Leatherbury denied making the statements. *Id.*; Leatherbury Decl. ¶ 28. Leatherbury suggested that the union employees might be out to get him, but confirmed that he had never worked with these two employees before. Sullivan Decl. ¶ 6.

### 3. Termination Decision

Throughout May 2009, Merritt and Kenneth Engel, the Vice President of HR, were engaged in delicate negotiations with two workers unions over new collective bargaining agreements. Merritt Decl.

4

¶ 8. In prior negotiations, C&H had expressed an intent to remove the belt foreman job. *Id.* By 2009, C&H no longer intended to remove that job, but the unions were skeptical of C&H's new position. *Id.*; Decl. of Kenneth J. Engel in Supp. of Defs.' Mot. for Summ. J. ("Engel Decl.") ¶ 4. When Leatherbury cleared the conveyor jam, he was performing work that should have been done by the belt foreman. Merritt Decl. ¶¶ 9-10; Engel Decl. ¶ 5.

Leatherbury's clearing of the conveyor and his comments to the other union employees about the strike were mentioned to Engel and Merritt by the union negotiator several times. Merritt Decl. ¶ 12. Because of these incidents, the union negotiator expressed further doubt about C&H's intentions regarding the belt foreman position, and he asked about C&H's plans to bring in replacement employees in the event of a strike. *Id.* Merritt concluded that "Mr. Leatherbury's actions changed the dynamic of the negotiations in a very negative way for the company." *Id.* Engel found Leatherbury's comments especially damaging because C&H was trying to build a more cooperative relationship with the unions, and it did not want to suggest it was preparing for a union strike. Engel Decl. ¶ 7.

At this point it was clear to Engel that C&H "could not afford any additional outbursts from Leatherbury that could further upset the negotiations," and so Engel and Merritt had a meeting with Sullivan. *Id.* at ¶ 8. Engel asked Sullivan how Leatherbury was performing, and Sullivan reported that Leatherbury was still new, but he was not progressing well in his training. *Id.* Based on this, Engel suggested they terminate Leatherbury immediately, before he could further damage union negotiations, and Merritt and Sullivan agreed. *Id.* Engel is from New York, and had never met Leatherbury, and he had no knowledge of Leatherbury's race or medical condition. *Id.* at ¶ 10.

On the morning of May 29, 2009, Engel, Merrit, and Sullivan met with HR Manager Cronin, and they discussed the decision to terminate Leatherbury. Sullivan Decl. ¶ 14. Cronin agreed with the decision. *Id.* Leatherbury was informed of the decision later that day. *Id.*

### 4. Medical History

Leatherbury's job offer at C&H was conditioned on passing a medical examination. Decl. of Matthew A. Goodin in Supp. of Defs.' Mot. for Summ. J., Ex. A ("Leatherbury Dep.") 52-53. This was administered by Dr. Steven Guest at the C&H medical clinic. *Id.* Leatherbury told Dr. Guest that he

5

had Klinefelter's syndrome, a genetic disorder where a male has one Y and two X chromosomes, and Dr. Guest told Leatherbury to get a note from his doctor saying that he could perform the duties at C&H, including walking, climbing, pushing, and pulling. *Id.* Subsequently, Leatherbury submitted a letter from his Veterans Affairs doctor confirming that his disorder would not interfere with the safe execution of his duties at work. Frucht Decl., Ex. C.

Also prior to his work at C&H, Leatherbury was diagnosed with osteoarthritis, carpal tunnel syndrome, and sleep apnea. Leatherbury Decl. ¶ 4. None of these limited Leatherbury's ability to work as a Warehouse Supervisor. *Id.* Leatherbury did not tell Dr. Guest about these conditions. Leatherbury Dep. 65. Four months after he had been working at C&H, the Department of Veterans Affairs granted him a 10% disability rating for the osteoarthritis of his knees. Frucht Decl., Ex. D.

Leatherbury's transfer to the Packing Supervisor position caused his knees to hurt because of the increased amount of climbing and crawling in that position. Leatherbury Decl. ¶¶ 26-27. On May 27, 2009, Leatherbury went to the C&H medical office, and the doctor's assistant Kassina Lacer gave him Icy Hot and Motrin, and instructed him to return the next day to see the doctor. *Id.* at ¶ 27. Leatherbury returned to work, and then emailed Sullivan and Lee, telling them that he could not perform as a Packing Supervisor because of the arthritis in his knees. *Id.*

The next day, Leatherbury returned to the doctor's office. *Id.* at ¶ 28. Although the doctor was not in, Leatherbury gave Lacer a copy of his disability rating for osteoarthritic knees from Veterans Affairs, and then he returned to work. *Id.* The following day, May 29, he returned once again to the see the doctor. *Id.* at ¶ 29. Dr. Guest examined Leatherbury, and then gave him a bottle of "super Motrin." *Id.* Dr. Guest cleared Leatherbury to return to work with no restrictions, and he worked the rest of that day (his last day). *Id.*; Leatherbury Dep. Ex. 35.

After Leatherbury left, Dr. Guest called Cronin to his office. Decl. of Francine Cronin in Supp. of Defs.' Mot. for Summ. J. ("Cronin Decl.") ¶ 6. Dr. Guest explained that Leatherbury was concerned about continuing his work as packing supervisor because he was experiencing knee pain, although Dr. Guest cleared him to return to work without restrictions. *Id.* Dr. Guest explained that this was from a preexisting injury, and thus it may have to be handled outside the regular workers' compensation system. *Id.*

6

When Cronin returned to her office, Engle, Merrit, and Sullivan were already there to discuss the termination of Leatherbury. *Id.* at ¶ 7. It was only after they had outlined their reasons for termination that Cronin informed them of the discussion she had with Dr. Guest. *Id.* at ¶ 8. Engel stated that this did not matter since they had already made the decision to terminate Leatherbury. *Id.* at ¶ 8.

## LEGAL STANDARD

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that "the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *See T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49 (2d Cir. 1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**1.      Disability Discrimination**

In disability discrimination cases under California's Fair Employment and Housing Act ("FEHA"), the Court must apply the three-step analysis framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000). First, the plaintiff must make a *prima facie* showing of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802.  The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Id.* Finally, the burden shifts back to the plaintiff to show that the employer's proffered explanation is merely a pretext for a discriminatory motive. *Id.* at 804.

A *prima facie* showing of disability discrimination under FEHA requires the plaintiff to demonstrate: (1) that the plaintiff suffers from a disability; (2) that the plaintiff is otherwise qualified to do his job; and (3) that the plaintiff suffered an adverse employment action because of his disability. *Zivkovic v. So. Cal. Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002); *Faust v. Cal. Portland Cement Co.*, 58 Cal. Rptr. 3d 729, 745 (Cal. Ct. App. 2007).  Under FEHA, the definition of disability should be broadly construed. *See* Cal. Gov't Code § 12993.

**A.      *Prima Facie* Showing**

Leatherbury contends that he was disabled because of the osteoarthritis in his knees, which only began to bother him when he was assigned a position as Packing Supervisor, and that C&H fired him because of his disability.  Under California law, Leatherbury must establish that the osteoarthritis limited his ability to participate in major life activities, which include physical activities and working. Cal. Gov't Code § 12926, subd. k.

Defendants argue that Leatherbury was not disabled because the pain in his knees could be controlled with pain medication, Dr. Guest cleared him for work without restrictions, and Leatherbury continued to work until he was terminated.  California courts have held that "[a]n employer does not have to accept an employee's subjective belief that he is disabled and may rely on medical information in that respect." *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 347 (2008) (finding the employee's

8

pain and numbness were subjective, and the employer was entitled to rely on the fact that the physician returned the employee to work without any restrictions). *Accord Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000); *Tyler v. Ispat Inland, Inc.*, 245 F.3d 969, 974 n.1 (7th Cir. 2001); *Burns v. Snow*, 130 Fed. Appx. 973, 982–83 (10th Cir. 2005). Reliance on medical opinion and an individualized assessment is especially important when the symptoms are subjective and the disease is of a type that varies widely between people. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198–99 (2002). Although pain can be a disability under FEHA, it must actually limit the employee's ability to work. *See Arteaga*, 163 Cal. App. 4th at 348 (employee was not disabled because pain did not interfere with work); *Glow v. Union Pac. R. Co.*, 652 F. Supp. 2d 1135, 1147 (E.D. Cal. 2009). *Compare Huck v. Kone Inc.*, C 10-01845 RS, 2011 WL 6294466 (N.D. Cal. Dec. 15, 2011) (employee suffered disabling pain and his doctor advised him that he should not work with his condition).

Here, Leatherbury fails to show that his condition caused him to be disabled under the FEHA requirements. The fact that he did suffer from osteoarthric knees, among other medical conditions, is not enough. He must also show that his disability actually interfered with his employment at C&H. Examinations by medical doctors cleared him for his work at C&H. Although Leatherbury alleges that the climbing and crawling required by his job was made more difficult by his osteoarthritis, he was able to complete his job successfully each day. Dr. Guest did not restrict him from climbing or crawling, even after he was shown the Veterans Affairs letter and examined Leatherbury. Plaintiff's supervisors only faulted him for poor performance regarding his knowledge and communications, not his physical inabilities. Indeed, he was reprimanded for performing extra manual labor that was reserved for union employees. Therefore, although he had legitimate medical problems, Leatherbury cannot show that his osteoarthritis limited his ability to perform his duties at C&H. Just like in *Arteaga*, Leatherbury has no proof that his osteoarthic knees actually interfered with his employment other than his own opinion, and a medical doctor found that he could perform all of the functions of a Packing Supervisor, with no restrictions. As the *Arteaga* court held, C&H is permitted to rely on the medical determination that Leatherbury's osteoarthritis did not interfere with his employment. Therefore, Leatherbury has not made a *prima facie* showing that he was disabled under FEHA.

### B.    Non-discriminatory Reason for Adverse Employment Action

Even if Leatherbury could establish a *prima facie* case for disability discrimination, defendants can establish a non-discriminatory reason for firing Leatherbury. They assert that the two incidents where he spoke to union employees about a strike and cleared the conveyor in violation of the union agreement showed poor judgment and harmed their union negotiations. Furthermore, Leatherbury demonstrated a poor attitude when he said that he was not excited about his new position, and he was not learning his new position quickly. Each of these is a legitimate non-discriminatory reason for terminating Leatherbury.

Leatherbury's refutation of these reasons misses the mark. Even though Leatherbury still believes that he acted correctly in clearing the conveyor jam because there was a safety issue, it is undisputed that his superiors all believed that there was no safety issue; and therefore this is a non-discriminatory reason to fire him. Similarly, Leatherbury's assertion that he was never told secrets about how the factory would respond in the event of a strike does not matter. Whether he told company secrets to union employees or not, it is undisputed that his superiors believed the union employees' story and that the statements showed poor managerial judgment and decision-making. Finally, Leatherbury admits that he said that he was not excited about his new job and he performed poorly on a quiz. Although he makes excuses for his poor performance, they have nothing to do with his osteoarthritic knees, and thus this was also a non-discriminatory reason for C&H to fire him.

Leatherbury cannot meet his burden to show that these reasons are merely pretext for discrimination. He attempts to cast doubt on these reasons by pointing to his history of good performance and the timing of the termination so swiftly after he had complained to the doctor. Leatherbury also points to the fact that the position of second Packing Supervisor was created just for him, and a replacement was never hired, to draw an inference that he was set up to fail. He also alleges that the union workers were out to get him, and C&H failed to protect him. However, Leatherbury fails to show that the decision makers at C&H did not have non-discriminatory reasons to terminate him, and that at least Engel, the primary decision maker and highest ranking officer as HR Vice President, was unaware of the osteoarthritis when he made his decision. The FEHA does not require "the employer

to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Arteaga*, 163 Cal. App. 4th at 344.

Therefore, the Court finds there is no genuine issue of material fact that C&H fired Leatherbury because of a disability.

### C. Related Disability Claims

For similar reasons, Leatherbury's related disability claims must also fail. His fourth and fifth causes of action allege that C&H failed to engage in an interactive process for his disability, and failed to accommodate his disability. However, there is no basis for these derivative claims because plaintiff has not shown that he suffered a disability. Moreover, Leatherbury has admitted that he never asked for accommodation or initiated a discussion with C&H about accommodating his osteoarthritis. *See* Cal Gov't Code § 12940(n) (employee must initiate the interactive process by requesting a reasonable accommodation). Therefore, the Court finds there is no genuine issue of material fact that C&H violated FEHA by failing to accommodate or engage in an interactive process.

### 2. Race Discrimination

To establish a *prima facie* case of race discrimination, Leatherbury must prove: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) some other circumstance suggests discriminatory motive. *Guz*, 24 Cal. 4th at 355 (2000). Here, Leatherbury alleges that Lemmie Adams favored African-American employees over Caucasian employees because he gave them more praise and a "gold star," and therefore Adams transferred Leatherbury to the dock, which ultimately led to his termination.

Leatherbury fails to make a *prima facie* case for discrimination because he fails to show that Adams caused any adverse employment actions. The decisions for Leatherbury's termination and for his transfer to the position of Packing Supervisor were made after Adams left C&H. Adams gave Leatherbury a positive review, and Leatherbury liked his position on the docks. Leatherbury asserts that the transfer to the docks, a temporary position, was part of Adams's scheme to get rid of Leatherbury.

11

However, Leatherbury does not dispute that it was Merritt, not Adams, who made the decision to transfer him to the docks at the request of Burchell. Additionally, the receipt of praise or a "gold star" were not tied to any employment metrics, pay raises, or other real employment actions. Leatherbury does not allege that any other decision-makers at C&H besides Adams had racist motives. Therefore, the Court finds there is no genuine issue of material fact that C&H fired or transferred Leatherbury because of his race.

### 3.     Retaliation

To make out a *prima facie* case of retaliation, the plaintiff must show: "(1) involvement in protected activity opposing an unlawful employment practice, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action." *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006).

Leatherbury alleges in his sixth cause of action that he engaged in the protected activity of complaining to HR about Adams's racially discriminatory actions, and that in retaliation Adams moved him to a position in the docks. However, even assuming that his complaint was a protected activity, Leatherbury admitted that he liked his transfer to the dock, and he only suffered when he was transferred to the Packing Supervisor position, which occurred after Adams left. More importantly, it was Merritt who made the decision to transfer Leatherbury to the docks, not Adams.

Therefore, the Court finds there is no genuine issue of material fact that C&H transferred Leatherbury in retaliation for his complaints of racism.

### 4.     Wrongful Termination and Failure to Prevent Discrimination and Retaliation

Leatherbury's seventh and eighth causes of action allege wrongful termination in violation of public policy, and failure to prevent discrimination and retaliation in violation of FEHA. These are derivative claims of his retaliation, disability and racial discrimination claims. Thus, because there is no basis for the underlying discrimination and retaliation claims, the wrongful termination and failure to prevent discrimination and retaliation must also fail. *See Trujillo v. N. Cty. Transit Dist.*, 63 Cal. App. 4th 280, 288-89 (1998) ("Employers should not be held liable to employees for failure to take

1 necessary steps to prevent [discriminatory] conduct, except where the actions took place and were not 2 prevented."). Therefore, the Court finds there is no genuine issue of material fact that C&H wrongfully 3 terminated Leatherbury or failed to prevent retaliation or discrimination against Leatherbury.

### 5. Failure to Pay Overtime

In Leatherbury's ninth cause of action, he alleges that C&H misclassified him as an exempt employee, and then failed to pay him for his overtime hours. Under California law, employees are entitled to overtime pay if they work more than 8 hours a day or 40 hours a week, unless they are properly classified in one of the narrow exemption categories. *See* Cal. Labor Code §§ 510, 515, subd. (a). These exemptions must be narrowly construed. *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 794-95 (1999). "They are applied only to those employees plainly and unmistakably within their terms and spirit." *In re United Parcel Serv. Wage & Hour Cases*, 190 Cal. App. 4th 1001, 1010 (2010), *review denied* (Feb. 23, 2011) (quotations omitted). "Moreover, the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption." *Ramirez*, 20 Cal. 4th at 794-95. For C&H to show that Leatherbury was an exempt employee under the executive exemption, it must show:

> (1) his duties and responsibilities involve management of the enterprise or a "customarily recognized department or subdivision thereof"; (2) he customarily and regularly directs the work of two or more employees; (3) he has the authority to hire or terminate employees, or his suggestions as to hiring, firing, promotion or other changes in status are given "particular weight"; (4) he customarily and regularly exercises discretion and independent judgment; (5) he is primarily engaged in duties that meet the test of the exemption; and (6) his monthly salary is equivalent to no less than two times the state minimum wage for full-time employment.

*In re United Parcel Serv.*, 190 Cal. App. 4th at 1014 (citing Cal. Code Regs. tit. 8, § 11090, subd. 1(A)(1)). Because the exemption requirements use conjunctive language, C&H is required to establish all of the elements. *Id.*

C&H asserts that Leatherbury is exempt under the executive exemption, because his position was a management position and his primary responsibility was to supervise 8-12 union employees. He was responsible for ensuring they followed company administrative and safety procedures, and he had discretion about whether to force them to work overtime, whether to pull them from other stations,

13

whether to issue discipline, whether to load sugar from AS/RS or the floor inventory, and how to troubleshoot various issues that arose. *See In re United Parcel Serv.*, 190 Cal. App. 4th at 1025 (finding duties such as issuing discipline, troubleshooting operational difficulties, and advising employees were all matters that required executive discretion). Leatherbury's description of his typical day shows that his primary duties were either the direct supervision of the union employees or other activities that were "directly and closely related to exempt work" or were "a means for carrying out exempt functions or [were] closely related to the supervision of the union employees." Cal. Code Regs. tit. 8, § 11090, subd. 1(A)(1)). Although Leatherbury's conclusory declaration describes 70% of his work as "clerical," much of the shift reports, inventory reports, managerial meetings, checking over the plant, and troubleshooting various problems were "directly and closely" related to his management of the union employees, and thus are still considered exempt work. Therefore, he meets the test for the first, second, fourth, and fifth criteria. There is no dispute that Leatherbury was paid more than two times the state minimum wage, meeting the sixth criterion.

Plaintiff primarily asserts that his job did not meet the third criterion for an executive employee, which requires that he had the authority to hire and fire other employees or that his suggestions were given "particular weight." Leatherbury never recommend that any employee be hired or fired, in part because the collective bargaining agreements constrained C&H, and they could not afford to hire more union workers. However, HR managers Cronin and Stradleigh testified that it was the practice at C&H for Warehouse Supervisors to participate in the interview process, and their opinion about the hiring or firing of an employee was given "a great deal of deference." Thus, the third criteria is also met.

Therefore, the Court finds that there is no material issue of fact that Leatherbury was an exempt employee within the terms and spirit of section 11090, and thus he is not entitled to overtime payments from C&H.

///

14

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion for summary judgment. (Docket Nos. 48, 55).

**IT IS SO ORDERED.**

Dated: November 29, 2012

SUSAN ILLSTON
United States District Judge